# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The Premises at 219 Austin Street, Albemarle, North Carolina 28001

)
)
)
)
)
)

Case No. 1:22MJ 228

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The Premises at 219 Austin Street, Albemarle, North Carolina 28001; see also Attachment A

located in the _____Middle_____ District of _____North Carolina_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 United States Code 841(a) and 846; | Possession with intent to distribute controlled substances, and conspiracy to do the same; |
| 18 USC 1956 and 1957 | Money Laundering |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ Thomas J. Laverde
_____
*Applicant's signature*

Thomas J. Laverde, Task Force Officer, DEA
_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 5/20/2022

City and state: Winston-Salem, North Carolina

_____
*Judge's signature*

The Honorable Joi E. Peake, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>THE PREMISES AT 219 AUSTIN STREET ALBEMARLE, NC 28001 ("SUBJECT PREMISES") | Case No. 1:22MJ _228_ |

**AFFIDAVIT IN SUPPORT OF
APPLICATIONS UNDER RULE 41 FOR
WARRANT TO SEARCH AND SEIZE**

I, Thomas Laverde, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this Affidavit in support of Applications under Rule 41 of the Federal Rules of Criminal Procedure for Search Warrant authorizing the search of the following: the premises known as 219 Austin Street, Albemarle, NC 28001 ("**SUBJECT PREMISES**"), further described in **Attachment A**, for the items described in **Attachment B.**

2.      I am a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA") and have been so assigned since December 2019.  I have more than 10 years of law enforcement experience, including over four years in narcotics investigations. I have received over 800 hours of basic, in-service, and specialized law enforcement training.  Based on my law enforcement training and experience, I am familiar with the methods, habits, and practices of drug traffickers.  I have participated in numerous federal and state drug investigations, including

investigations involving violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952(a), and 963, and 18 U.S.C. §§ 924, 1956, 1957, and 2. My experience in this area includes undercover drug purchases, surveillance, searches and seizures, arrests, intelligence analysis, analysis of devices seized from drug traffickers, interviews and interrogations, drug interdiction operations, and clandestine drug laboratories. Additionally, my training and experience has familiarized me with practices drug traffickers employ to collect and launder drug trafficking proceeds, including methods drug traffickers use to disguise the source and nature of their drug trafficking profits.

3.      Based on my training and experience, I am familiar with narcotics traffickers' and money launderers' methods of operation, including the distribution, storage, and transportation of narcotics, the collection of money proceeds of narcotics trafficking, and methods of money laundering used to conceal the nature of the proceeds. I have conducted investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952(a), and 963, and 18 U.S.C. §§ 1956 and 1957.

4.      The information in this Affidavit is based upon my background and experience, my personal observations and knowledge of this investigation, and information provided to me by other law enforcement officers, confidential sources, cooperating defendants, and other witnesses and persons. Because of the limited purpose of this Affidavit, I have not included each and every fact known to me

regarding this investigation, but only those facts I believe necessary to establish probable cause for these Warrants.

5.     Based on the facts set forth in this Affidavit, probable cause exists to believe that the **SUBJECT PREMISES** contains evidence, contraband, fruits and instrumentalities, and property intended to be used in connection with the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. §§ 1956 and 1957.

## CHARACTERISTICS OF DRUG TRAFFICKERS AND MONEY LAUNDERERS

6.     Based upon my training, experience, and participation in other drug investigations involving large amounts of controlled substances and bulk-cash drug proceeds, I know the following to be true about drug traffickers and money-launderers:

    a. Drug traffickers and money-launderer's commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances;

    b. Drug traffickers and money-launderer's commonly maintain address and/or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking/money-laundering organization, or of customers;

    c. Drug traffickers and money-launderer's maintain the aforementioned books, records, receipts, notes, ledgers, etc., where they have ready access to them;

    d. Drug traffickers and money-launderer's commonly secrete drugs and other contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, businesses, storage units, and/or other locations so that they have ready access to

3

these items, and to conceal these items from law enforcement authorities;

e. Drug traffickers and money-launderer's commonly maintain items used to manufacture, conceal, package, and distribute controlled substances within their residences, their businesses, their vehicles, and/or other locations over which they maintain control so that they have ready access to these items, and to conceal these items from law enforcement authorities;

f. Drug traffickers and money-launderer's commonly take or cause to be taken photographs of themselves, their associates, their drugs, drug proceeds, and firearms, and they usually maintain these photographs in their possession;

g. Drug traffickers and money-launderer's commonly maintain large amounts of U.S. currency used to finance their ongoing narcotics business, as well as money wrappers and currency counting machines, within their residences, vehicles, and other locations over which they have control;

h. Drug traffickers and money-launderer's commonly maintain large amounts of U.S. currency used to finance their narcotics business in secure locations within their residences and vehicles, such as safes and lock boxes.

i. The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, and particularly, trafficking in controlled substances and money-laundering;

j. Drug traffickers and money-launderer's commonly equip their residences with surveillance cameras to provide early warning of other criminals who would attempt to rob them of their drugs and proceeds or commit violence against them, and to provide early warning against law enforcement;

k. Drug traffickers and money-launderer's commonly use and maintain firearms to protect their drugs and/or drug proceeds;

l. Drug traffickers and money-launderer's commonly use cellular telephones and other electronic devices, such as tablets and laptops, to facilitate their drug trafficking activities, and they commonly store the following, among other things, on such devices: records and documents as detailed in subparts a through c above, text messages concerning

4

criminal activity, call details concerning telephone numbers that the device called or received calls from, and photographs of themselves, associates, drugs, contraband, firearms, and drug proceeds; and

m. Drug traffickers and money-launderer's frequently maintain the above items in subparts a through l in their residences and in their vehicles, where they have ready access to them.

## PROBABLE CAUSE

7. Since approximately February 2020, DEA has been conducting a long-term investigation concerning the drug trafficking and money laundering activities of a significant drug trafficking organization (the "BARRERA DTO" or the "DTO") headed by Salvador Barrera, Jr. ("BARRERA") that is operating in the Charlotte area, within the Western District of North Carolina. Thus far, the investigation has led to the seizure of over 26 kilograms of cocaine, seven kilograms of fentanyl, a kilogram of heroin, and approximately $730,000 in bulk cash from the DTO. Additionally, investigators have conservatively corroborated the DTO's successful acquisition and re-distribution of over 200 kilograms of cocaine, the laundering of over $3 million in drug proceeds, and the planning and preparation for the acquisition and distribution of 50-to-100-kilogram shipments of cocaine/fentanyl on a regular basis beginning in September of 2021.

8. On April 20, 2022, a federal grand jury in the Western District of North Carolina indicted eleven members of the DTO on federal drug trafficking charges. On May 18, 2022, a federal grand jury in the Western District of North Carolina returned a superseding indictment charging the following fourteen members of the DTO on

federal drug trafficking charges:[1] (1) Salvador Barrera, Jr. ("BARRERA"); (2) Ricardo Jonathan Gomez ("GOMEZ"); (3) Luis Raymundo Macias-Robles ("MACIAS"); (4) Martin Meza-Rosales ("MEZA"); (5) Johnny Lane Owens, Sr. ("OWENS"); (6) Adrian Christopher Solares ("SOLARES"); (7) Isaac Sandoval ("SANDOVAL"); (8) Christian Alexander Hernandez ("HERNANDEZ"); (9) Janquil Josselyn Jackson ("JACKSON"); (10) Christok Alexander Sandoval Mata ("MATA"); (11) David George Jansen ("JANSEN"); (12) Derek Duane Crump ("CRUMP"); (13) Norberto Macedo, Jr. ("MACEDO"); and (14) Jesus Adrian Perales ("JESUS PERALES").

9.      The evidence on which the indictment is based includes: (i) a number of controlled narcotics purchases by confidential sources and an undercover agent; (ii) traffic stops and ensuing searches leading to seizures of large quantities of narcotics and bulk cash; (iii) interviews of confidential sources, cooperating defendants, and some of the defendants themselves; and (iv) federal wiretaps on nine cellular devices used by members of the DTO.  The indictment remains under seal, and the investigation remains ongoing, with investigators currently monitoring federal wiretaps authorized in the Western District of North Carolina on cell phones used by DTO members MACEDO (TARGET TELEPHONE #8 or TT8) and Erik Perales ("ERIK PERALES") (TARGET TELEPHONE #9 or TT9).[2]

---

[1] On April 20, 2022, a federal grand jury in the Western District of North Carolina returned the original indictment in this matter, which charged eleven members of the DTO with federal drug trafficking charges.  The superseding indictment added three defendants and one drug trafficking count.

[2] ERIK PERALES remains uncharged as of the submission of this Affidavit.

6

10.     In summary, this investigation has revealed the following about the roles of the charged defendants.  BARRERA is the DTO's leader, responsible for obtaining multi-kilogram shipments of cocaine and fentanyl from sources of supply in Mexico, for supervising the distribution of those narcotics by other DTO members, and for coordinating the laundering of the proceeds from the sale of those narcotics.  GOMEZ is his right-hand man in running the DTO.  MACIAS and MEZA are managers in the DTO who arranged large shipments of cocaine from California to Charlotte.  JACKSON recruited couriers to drive the shipments of cocaine from California to Charlotte.  OWENS is one of BARRERA's primary kilogram-level redistributors of cocaine and fentanyl, who resides and operates primarily in Albemarle, North Carolina.[3]  CRUMP is one of OWENS's primary redistributors of narcotics. SOLARES, HERNANDEZ, SANDOVAL, and MATA are couriers who work for BARRERA and GOMEZ.  MACEDO and JESUS PERALES are lower-level distributors of narcotics for BARRERA.  Additionally, ERIK PERALES serves as a mid-level manager responsible for storing some of the DTO's bulk cash proceeds and also for supervising some of the DTO's lower-level drug distributors.[4]

11.     A summary of the investigation is as it relates to OWENS follows.  This summary includes only a portion of the significant events in this investigation relevant

---

[3] Albemarle is in the Middle District of North Carolina.

[4] *See supra* Footnote 2.

7

to OWENS, and is not a comprehensive summary of the investigation or the evidence derived therefrom:

a.      On January 13, 2021, DEA-Charlotte seized four kilograms of fentanyl from SANDOVAL and MATA during a surveillance operation.[5] Subsequent intercepted calls between BARRERA and OWENS on the wiretaps in the Western District of North Carolina confirmed that the fentanyl belonged to BARRERA, and that SANDOVAL and MATA were transporting it to OWENS for BARRERA.    During post-Miranda interviews, SANDOVAL admitted that he was on his way to deliver the fentanyl to a customer in Albemarle, North Carolina.    During MATA's interview, he confirmed that he had previously traveled with SANDOVAL on multiple occasions to deliver narcotics and pickup currency at a residence in Albemarle, North Carolina with a red roof, later determined to be located at **219 Austin Street, Albemarle, North Carolina, 28001** ("**SUBJECT PREMISES**"), described further below.

b.      On July 22, 2021, a court-authorized tracking device on SOLARES's truck—the same truck that SOLARES used to complete the money transactions with the money laundering organization described above—showed it traveling from Charlotte to Albemarle, where OWENS lives and operates.    Agents alerted local law enforcement in Albemarle. Those investigators conducted surveillance and saw SOLARES meet with OWENS at one of OWENS's businesses in Albemarle.    Surveillance officers could not see whether they exchanged anything.    After the meeting, SOLARES returned to Charlotte and went to 6010 Cedarwood Pointe Circle, Apartment #108.    Surveillance agents saw SOLARES carry a pink duffel bag from his truck into the apartment.    Approximately an hour and fifteen minutes later, GOMEZ and SOLARES exited the apartment carrying the pink duffel bag and drove away in SOLARES's truck.    Investigators had local law enforcement traffic-stop them.    During the traffic stop, a drug-detecting dog alerted to the odor of narcotics coming from the truck.    Law enforcement searched the truck and found $359,701 in bulk cash.    Shortly after law enforcement seized the money, GOMEZ and SOLARES changed cell phones.    Based on investigation and intercepted calls, investigators believe that between March and July of 2021, the BARRERA DTO made arrangements to launder approximately $1,000,000 with a money

---

[5] The traffic-stop and seizure actually occurred in Concord, in the Middle District of North Carolina.  But based on surveillance and post-*Miranda* interviews with SANDOVAL and MATA, they retrieved the fentanyl from a storage unit in Charlotte before driving it into the Middle District of North Carolina.

laundering organization out of New York. The $359,701 seized on July 22, 2021, constituted a single payment.

     c.     Based on intercepted communications over another cell phone used by BARRERA, on August 7, 2021, investigators conducted surveillance of delivery of six kilograms of fentanyl from a courier working for BARRERA's primary Mexico-based source of supply to HERNANDEZ, another courier working for BARRERA. Investigators attempted to traffic-stop HERNANDEZ to seize the narcotics, but HERNANDEZ successfully lost surveillance agents by conducting countersurveillance maneuvers. Subsequent intercepted communications confirmed that HERNANDEZ successfully obtained the narcotics and paid the source of supply's courier.

     d.     Investigators obtained a court-authorized tracking device for the vehicle used by the source of supply's courier to give the six kilograms of fentanyl to HERNADEZ on August 7, 2021. The courier drove to Ohio on August 13, 2021 and began driving back towards North Carolina the next day. DEA-Charlotte had investigators in Ohio traffic-stop the courier, leading to seizure of three kilograms of fentanyl from the courier's car. Around the same time that the traffic stop was occurring, DEA-Charlotte intercepted a call between BARRERA and his primary source of supply in Mexico, during which the source of supply confirmed that the three kilograms of fentanyl that the courier was bringing were exactly the same thing that the source of supply had provided to BARRERA a few days earlier.

     e.     At this time, pursuant to wiretaps authorized in the Western District of North Carolina, investigators are continuing to intercept DTO member MACEDO's communications over TARGET TELEPHONE #8 and DTO member ERIK PERALES's communications over TARGET TELEPHONE #9. [6]

---

[6] Investigators previously wiretapped three cell phones used by BARRERA, referred to herein as TARGET TELEPHONE #2 or TT2; TARGET TELEPHONE #5 or TT5; and TARGET TELEPHONE #7 or TT7. Investigators also previously wiretapped one cell phone used by MACIAS, referred to herein as TARGET TELEPHONE #1 or TT1. Investigators previously intercepted two cell phones used by OWENS, referred to herein as TARGET TELEPHONE #3 or TT3 and TARGET TELEPHONE #6 or TT6. Finally, investigators also wiretapped a cell phone used by SOLARES, referred to herein as TARGET TELEPHONE #4 or TT4. Collectively, this Affidavit refers to these phones, as well as TARGET TELEPHONE #8 or TT8 and TARGET TELEPHONE #9 or TT9, as the TARGET TELEPHONES.

    Throughout this Affidavit I refer to particular telephone calls and/or text messages intercepted over the TARGET TELEPHONES. Many of the intercepted telephone conversations occurred in Spanish, others in English, and some using both languages. The quoted telephone

## SUBJECT PREMISES #1
## Residence of Johnny Lane OWENS SR.

12.     As explained above, this investigation has identified OWENS as one of the BARRERA DTO's primary cocaine/fentanyl customers.    OWENS has prior convictions for:   (i) misdemeanor larceny and forgery of instrument, on March 15, 1995; (ii) breaking and entering, on November 1, 1995; (iii) possession with intent to sell or deliver marijuana, on October 14, 1996; (iv) trafficking in cocaine, on June 23, 1997; (v) possession of drug paraphernalia, on July 17, 2002; (vi) flee/elude arrest with a motor vehicle, on March 23, 2015; and (vii) DWI – Level 5, on December 14, 2017. He also has the following prior charges:   (i) larceny after breaking and entering and possession of stolen goods (dismissed); (ii) possession of firearm by felon and misdemeanor possession of a Schedule VI controlled substance (dismissed); (iii) possession of a Schedule II controlled substance (dismissed); (iv) possession with

---

conversations are not verbatim; they are based on a written summary or synopsis of the conversation from the linguist who monitored the telephone call.  With regard to the telephone conversations that occurred in Spanish, three caveats apply.  First, the conversations were translated by certified Spanish/English speaking contractors and then summarized or transcribed from Spanish into English.  Second, the quoted Spanish conversations are based on quotes from the summary or synopsis provided by the Spanish language translator.  Third, some of the words in the quoted phone conversations remain in their original Spanish when referring to specific code or drug lingo (e.g., mano, jale).  With regard to text conversations (if included), the conversations are quoted verbatim from English or translated from Spanish to English.  With regard to all telephone conversations and text messages, additional caveats apply.  First, I have not included everything discussed in a specific conversation, but rather pertinent material related to establishing probable cause.  Second, parenthetical comments and the explanations following the referenced telephone calls and/or text messages are my interpretation of the meaning of these words and the conversation as a whole, which is based on my training and experience, and the context of the conversations as they relate to the investigation to date.  I am familiar with the facts and circumstances of this investigation, and the information contained in this Affidavit is provided for the limited purpose of establishing probable cause; therefore, I have not included each and every fact known to me concerning this investigation.

intent to sell or deliver cocaine and felony possession of cocaine (dismissed); (v) possession with intent to sell or deliver a Schedule II controlled substance, possession with intent to sell or deliver a Schedule VI controlled substance, and a probation violation for forgery and uttering (all dismissed); and (vi) maintaining a vehicle or dwelling and felony selling cocaine (dismissed). On April 16, 2021, agents identified **219 Austin Street, Albemarle, North Carolina** (**SUBJECT PREMISES**) as the primary residence of OWENS and have confirmed this through members of the Albemarle Police Department who are familiar with OWENS and his suspected narcotic activities. Since April 18, 2021, agents/officers have conducted periodic surveillance at the location and have confirmed **SUBJECT PREMISES** is OWENS's primary residence. Physical and electronic surveillance has suggested OWENS spends most nights at **SUBJECT PREMISES** and lives there. Physical and electronic surveillance has also confirmed that and other members of the BARRERA DTO, including BARRERA, GOMEZ, and known drug and money courier, SOLOARES, have frequented the **SUBJECT PREMISES**. Additionally, investigators previously conducted surveillance operations in conjunction with the use of a cell-site simulator and confirmed the presence of OWENS's telephone and a telephone utilized by BARRERA at the **SUBJECT PREMISES.**

13. On January 13, 2021, agents seized approximately four kilograms of fentanyl from SANDOVAL and Christok Mata ("MATA"), during a traffic stop in Concord, North Carolina, after watching them retrieve the narcotics from a storage

11

unit in Charlotte. SANDOVAL's phone contained illicit communications with BARRERA concerning money laundering activities. Additionally, investigators interviewed SANDOVAL and MATA following their arrests. SANDOVAL told investigators that he was delivering the four kilograms of fentanyl seized from his car to a drug customer, whom was later identified as Johnny Owens ("OWENS") in Albemarle, North Carolina. MATA informed investigators that the customer lived in a house with a red roof in Albemarle, North Carolina, which was later identified as the **SUBJECT PREMISES**. MATA, explained that he accompanied SANDOVAL on three previous trips to meet with the customer at the **SUBJECT PREMISES**. MATA stated the first trip occurred approximately a year and a half prior and SANDOVAL delivered a kilogram of either cocaine/fentanyl and retrieved a large amount of U.S. currency. The second trip occurred approximately two months after the first and SANDOVAL delivered between one to two kilograms of cocaine/fentanyl in exchange for a large amount of cash. The third trip occurred approximately three to six months prior to their arrest SANDOVAL delivered approximately five kilograms of cocaine/fentanyl and retrieved a duffle bag full of currency. MATA told investigators that SANDOVAL has been a kilogram-level narcotics distributor for an extended period of time. In addition to those interviews, investigators have interviewed one other subject who identified SANDOVAL as a

12

multi-kilogram cocaine and fentanyl supplier.[7] The cooperating defendant revealed that SANDOVAL personally delivered between 50 – 60 kilograms of cocaine to the defendant from mid-2017 through October 2020.

14.     On March 30, 2021, investigators in Charlotte began monitoring TARGET TELEPHONE #1 (TT1), used by MACIAS and TARGET TELEPHONE #2 (TT2), used by BARRERA[8].

15.     On April 1, 2021 at approximately 1:18 pm, agents intercepted an

---

[7] This subject is a cooperating defendant facing pending federal drug trafficking charges in another district. Investigators interviewed him during a proffer session with his/her counsel present.

[8] Throughout this Affidavit I refer to particular telephone calls and/or text messages intercepted over the Target Telephones. Many of the intercepted telephone conversations occurred in Spanish, others in English, and some using both languages. The quoted telephone conversations are not verbatim; they are based on a written summary or synopsis of the conversation from the linguist who monitored the telephone call. With regard to the telephone conversations that occurred in Spanish, three caveats apply. First, the conversations were translated by certified Spanish/English speaking contractors and then summarized or transcribed from Spanish into English. Second, the quoted Spanish conversations are based on quotes from the summary or synopsis provided by the Spanish language translator. Third, some of the words in the quoted phone conversations remain in their original Spanish when referring to specific code or drug lingo (e.g., mano, jale). With regard to text conversations (if included), the conversations are quoted verbatim from English or translated from Spanish to English. With regard to all telephone conversations and text messages, additional caveats apply. First, I have not included everything discussed in a specific conversation, but rather pertinent material related to establishing probable cause. Second, parenthetical comments and the explanations following the referenced telephone calls and/or text messages are my interpretation of the meaning of these words and the conversation as a whole, which is based on my training and experience, and the context of the conversations as they relate to the investigation to date. I am familiar with the facts and circumstances of this investigation, and the information contained in this Affidavit is provided for the limited purpose of establishing probable cause; therefore, I have not included each and every fact known to me concerning this investigation.

13

outgoing call from BARRERA over TT2 to Johnny Owens ("OWENS")[9], who was using TARGET TELEPHONE #3 (704-641-8593).[10] During the conversation, BARRERA told OWENS the following: *"the friend[11] finally came through. They were trying to get him to say things, but they were trying to give him 18 years."* BARRERA then explained: *"he said he was smoking and they pulled him over. Once he was pulled over, they pretty much already knew what was going on."* BARRERA stated that SANDOVAL only said that *"he picked up a phone and did what the people told him to do."* BARRERA also stated that SANDOVAL said *"he did not know anything more than that. He cooperated by saying he had some things in his house, like some guns, but that was it."* BARRERA and OWENS continued to discuss the conversation that SANDOVAL and BARRERA had about SANDOVAL's arrest. BARRERA went into detail, indicating that *"his lawyers told him the best option was to cooperate because they tested that thing and they knew what it was. They assumed it was the other thing because they already knew he was working with that shit."* OWENS stated: *"they tested it and asked what it was?"* BARRERA replied: *"they said it was the other."* OWENS asked if *"it was not what they charged him*

---

[9] Based on additional intercepted communications and other investigative techniques, agents determine OWENS was BARRERA's main customer who resided at the **SUBJECT PREMISES** in Albemarle, North Carolina (approximately forty-five minutes east of Charlotte, North Carolina), within the Middle District of North Carolina. In conjunction with this filing, investigators have obtained search warrants in the Western District of North Carolina for ten different locations associated with the BARRERA DTO. Those warrants are currently under seal.

[10] This call corresponds to Session #19 over TT2.

[11] Based on my knowledge of this investigation, the "friend" that BARRERA referenced is SANDOVAL, the lower-lever DTO member traffic-stopped with approximately four kilograms of fentanyl on January 13, 2021, as described above.

with?" BARRERA said *"that's not what they charged him with . . . they want to charge him again and threw out 18 years if they were able to charge him with the other thing. With the [girl] he was looking at less than 10 years."* BARRERA said *"he said he was sorry and knew I always told him to never smoke, but he said they were high as fuck."* OWENS asked: *"what was he doing with that in the car?"* BARRERA replied: *"he was getting it ready to take to you* (OWENS)."

16.    Based on my training, experience, and knowledge of this investigation, in the above conversation, BARRERA was referring to the traffic stop mentioned in above. At the time of SANDOVAL's arrest, SANDOVAL was smoking marijuana and admitted to having marijuana in the vehicle. Law enforcement initially believed that that the narcotics seized from SANDOVAL were cocaine, and the state charged SANDOVAL with trafficking cocaine. Shortly after SANDOVAL's arrest, a confidential source told agents that the narcotics were fentanyl, and not cocaine. Agents submitted the four kilograms to the DEA laboratory, which confirmed the narcotics seized from SANDOVAL as 4.015 kilograms of fentanyl. During the conversation, BARRERA and OWENS discussed SANDOVAL's potential prison sentence if charged with fentanyl versus cocaine. BARRERA also told OWENS that SANDOVAL had been bringing the fentanyl to OWENS. BARRERA's description of what SANDOVAL told law enforcement reflects what SANDOVAL in fact told law enforcement during a post-arrest interview on January 13, 2021. The conversation about law enforcement trying to give SANDOVAL 18 years in prison appears to reflect SANDOVAL's expectation of the amount of prison time he potentially faces.

17.     On April 6, 2021 at approximately 4:21 pm, agents intercepted an incoming telephone call to BARRERA over TT2 from OWENS, who was using TARGET TELEPHONE #3.  The call lasted over twenty-five minutes.[12] During the conversation, BARRERA and OWENS discussed the quality of cocaine that BARRERA had previously provided to OWENS.  BARRERA told OWENS that "*I have some more coming in Thursday.  I have a better price for those at 34 and a half.*"  BARRERA asked if OWENS "*wanted to get something good?*"  OWENS replied: "*definitely, I have that one thing taken care of and had the rest of that.  I think it was 97 that I owe you.*"  Later in the conversation, BARRERA stated:  "*I am trying to get back on board with the [girl] and getting better prices.*"  BARRERA later told OWENS that "*I have a good amount of them and some are already gone, but I had about 10 days with those people.*"  OWENS said:  "*I do not need a whole lot of them . . . 5 or something like that.*"  BARRERA said:  "*okay.*"  OWENS told BARRERA that "*I have been opening them up and breaking them down. I would not lie to you, I try to make 2,000 off of those.*"  BARRERA said that "*some people were trying to sell bricks, but they were not making their money, only 100 to 200. I do not sell bricks to make only 100 or 200 bucks, that doesn't sound right.  Covid is fucking everything up . . . It will be back to normal for sure once everything starts to settle.  There are some guys out there buying 5 or 10 bricks and bringing them to the city*."  OWENS later asked BARRERA "*Did you talk with old boy and is he good?*"  BARRERA said "*yes, he is solid*

---

[12] This call corresponds to Session #133 over TT2.

and would never. *I had not talked to him, I heard what he was saying, but my father[13] spoke to him.*" BARRERA and OWENS continued to discuss conversations with "*old boy*" (SANDOVAL) being charged with cocaine instead of fentanyl. BARRERA went on to say, "*he told my father not to forget him if they did charge me with that shit and to try to help me out.*" At the conclusion of the conversation, OWENS told BARRERA "*not to forget about 5 for me.*" OWENS stated: "*keep me in mind on those* [*Nintendos*]." BARRERA replied: "*I am going to put 10 aside just in case you needed another 5.*"

18.     Based on my training, experience, and knowledge of this investigation, in the above call, I believe that OWENS and BARRERA discussed the prices of cocaine, BARRERA's attempt to get a better price of $34,500 per kilogram to pass along to OWENS, and the fact that BARRERA was expecting more kilograms of cocaine. OWENS told BARRERA that he owed him (BARRERA) $97,000. BARRERA then explained that other cocaine distributors are lowering prices and only making between $100 and $200 profit per kilogram sold. BARRERA stated that he did not sell "bricks," a common reference to a kilogram quantity of narcotics, to only make $100 to $200. During the middle of the conversation, OWENS expressed his concern over "old boy," which was a reference to SANDOVAL, and asked he was good, meaning that SANDOVAL would not cooperate with law enforcement. BARRERA then explained that he did not talk directly with SANDOVAL, but was

---

[13] Investigators suspect that BARRERA's father is the "godfather" and puppet-master of the DTO and that he has turned over the DTO's day-to-day operations to his son, BARRERA.

17

present when SANDVOAL was talking with his father, Salvador Barrera Sr. ("BARRERA SR.")[14]. BARRERA said SANDOVAL expressed concern about law enforcement correcting his charges from cocaine to fentanyl, which would give him a lengthier prison sentence. BARRERA said, SANDOVAL then told BARRERA SR. to "*not to forget about me and to try to help me out.*" At the end of the conversations, OWENS told BARRERA he wanted five more kilograms, and BARRERA stated that he would set aside 10 kilograms of cocaine for OWENS after receiving the next shipment.

19.     On April 16, 2021, agents conducted physical surveillance in conjunction with geo-location information for telephone number (704) 641-8593 (TT3) and the use of a court-authorized cell-site simulator in Albemarle, North Carolina and located OWENS's telephone at the **SUBJECT PREMISES**. Additionally, agents identified a 2017 Chevrolet GMC truck registered to OWENS parked in the driveway of the **SUBJECT PREMISES**.

---

[14] Based on the meeting that took place between SANDOVAL and BARRERA SR. investigators believe SANDOVAL reported to BARRERA SR. to explain his arrest and the seizure of the four kilograms of fentanyl. Investigators believe BARRERA SR.'s role within the DTO is that of the god-father with a hands-off approach overseeing and managing the organization from a distance. Throughout this investigation, agents have linked BARRERA SR. to different aspects of the DTO; including assisting with the facilitation of the acquisition of vehicles, houses, and a storage unit used by members of the DTO. It appears as though BARRERA SR. has placed his son, BARRERA JR., in the role of managing director of the DTO's operations and BARRERA SR. has gone to great lengths to stay out of the limelight.

20.     On April 30, 2021, agents began intercepting OWENS's telephone (TARGET TELEPHONE #3, "TT3") and monitored his communications until he effectively stopped using the telephone on or about July 10, 2021.

21.     Throughout the course of interceptions, agents recorded and confirmed OWENS's involvement with the acquisition and distribution of illegal narcotics, as well as his frequent presence at the **SUBJECT PREMISES** in a manner consistent with him living there.  For instance, on June 10, 2021, agents intercepted and incoming call from Derek Crump ("CRUMP"), using (980) 734-6461[15].  During the conversation CRUMP asked, "*Are you around?*"  OWENS replied "*Yes.*"  CRUMP said, "*I am coming in about 20 – 30 minutes for half a case.*"  OWENS said, "*Alright, give me a call.*"

22.     Based on my training, experience, knowledge of this investigation, and information provided by CRUMP during an interview on September 28, 2021, I know that during the above telephone call CRUMP ordered ½ a kilogram of cocaine from OWENS.

23.     Approximately twenty minutes later, agents intercepted and outgoing call from OWENS over TT3 to CRUMP[16].  During the conversation, CRUMP said, "*Jay, I need a little bit.  I am waiting on my boy that is coming from Troy.  It won't take long, my boy is on his way*."  OWENS said, "*Alright, just give me a holler.*"  Based on the

---

[15] This call corresponds to Session #591 over TT3.

[16] This call corresponds to Session #594 over TT3.

19

intercepted telephone calls, agents requested assistance from local authorities to conduct surveillance at the **SUBJECT PREMISES**.

24.     Approximately an hour and a half later, agents intercepted an incoming telephone call from CRUMP to OWENS over TT3[17].   During the conversation, CRUMP said, "*I am pulling in.*"  OWENS, "*I will be there in five minutes.*"  Local officers arrived at the location approximately ten minutes later and upon arriving at the **SUBJECT PREMISES** observed a black male entering the passenger side of a dark colored passenger car and depart; however, were unable to follow them away.

25.     Based on my training, experience, and knowledge of this investigation, I believe CRUMP met OWENS at the **SUBJECT PREMISES** to obtain the previously requested ½ kilogram of cocaine.

26.     On June 29, 2021 agents intercepted and outgoing call from OWENS, using TT3 to CRUMP, using (980) 734-6461[18].  During the conversation, CRUMP asked: "*What is the lowest you could do on two whole ones?*"  OWENS said "*I have just been trading money with you and I am stuck on the hourly P/H.  I can do $38 a piece.*"  CRUMP said: "*I will call you back.*"

27.     Based on my training, experience, and knowledge of this investigation, I know CRUMP called and asked OWENS what would be the lowest price OWENS would be willing to sell two "*whole ones*" referring to kilogram quantities of what I

---

[17] This call corresponds to Session #597 over TT3.

[18] This call corresponds to Session #755 over TT3.

believe was cocaine. When OWENS responded he could "do $38 a piece," I know OWENS was advising CRUMP that he would sell CRUMP each kilogram for $38,000, which was consistent with the current prices of a kilogram of cocaine at that time, ranging from $38,000 - $40,000/each.

28.     On July 20, 2021, location data for SOLARES's phone showed that SOLARES traveled to Albemarle, North Carolina, where OWENS resides. Approximately one hour later, location data for SOLARES's phone showed that it was in the area of GOMEZ's apartment located within the Cedarwood Point Apartments at 6010 Cedarwood Point Circle, Charlotte, North Carolina. Approximately forty-five minutes later, investigators established surveillance in the area of GOMEZ's apartment. Upon arriving, agents observed GOMEZ's GMC truck parked in a handicap spot in front of building #6010.   Approximately an hour later, Investigators observed SOLARES exit the apartment building and enter a black Jeep Laredo displaying a temporary license plate. Location data for SOLARES's telephone showed that it was in the area of another apartment complex located at University Station Circle, Charlotte, NC.   Shortly after SOLARES departed, Investigators observed GOMEZ exit the apartment, carrying a large gym bag and one smaller bag over his shoulder.  GOMEZ departed the parking lot and Investigators attempted to follow him; however, were unable to and surveillance was discontinued.   At

21

approximately 5:30 p.m., Investigators located SOLARES's black Jeep parked in front of 8230 University Stations Circle, Charlotte, North Carolina[19].

29.     On July 21, 2021, location data for SOLARES's phone showed that SOLARES was traveling east towards Albemarle, North Carolina. Investigators attempted to locate SOLARES and OWENS to conduct surveillance of a possible meeting, but were unsuccessful. Agents then established surveillance at multiple locations in the Charlotte area in anticipation of SOLARES's return. SOLARES eventually arrived at GOMEZ's apartment complex located at Cedarwood Point Circle in Charlotte. SOLARES was driving the same tow-truck that he used during the April 7, 2021 money transaction with LIN. SOLARES exited the tow-truck and carried a backpack inside building #6010 of the apartment complex. Later the same evening, agents obtained a GPS tracking warrant and installed a tracking device on SOLARES's tow-truck.

30.     On July 22, 2021, location data for SOLARES's tow-truck showed that it was again traveling east towards Albemarle, North Carolina. Agents requested assistance from local authorities, who were able to conduct surveillance and see OWENS meeting with SOLARES at one of OWENS's businesses in Albemarle approximately ¼ mile from the **SUBJECT PREMISES**. Surveillance officers were

---

[19] Although unaware of the exact apartment building and number, Investigators were familiar with this apartment complex from prior location data associated with SOLARES telephone beginning on or about July 14, 2021.

unable to determine if anything was exchanged.[20]    After the meeting, agents followed the tow-truck to GOMEZ's apartment in Charlotte.  SOLARES exited the tow-truck and carried a pink duffel bag into GOMEZ's apartment.  Shortly thereafter, GOMEZ arrived at the apartment complex in his GMC truck and went inside the apartment. Approximately an hour and fifteen minutes later, GOMEZ and SOLARES exited the apartment carrying the pink duffel bag and they drove away in the tow-truck. Investigators had local law enforcement traffic-stop them.  During the traffic stop, a drug dog alerted to the odor of narcotics coming from the tow-truck.  Law enforcement searched the tow-truck and found $359,701 in bulk cash.

31.    On August 16 and 17, 2021, agents intercepted communications between UM38 and BARRERA in which UM38 informed BARRERA that he had a hundred kilograms ready to send to Los Angeles and then invited BARRERA to come to Mexico to see the drug operation.

32.    On August 17, 2021 at approximately 6:49 pm, agents intercepted an incoming call over TT7 to BARRERA from UM38, who was using 52-3231757759.[21] During the conversation, BARRERA told UM38 that he and his brother-in-law (GOMEZ) would be coming to Mexico on a flight on Saturday (August 21, 2021) and

---

[20] Based on intercepted communications occurring over TT5 on July 21, 2021, agents were aware that BARRERA had obtained three new telephones earlier the same day, and agents believed the meeting could possibly have been just to pass telephones or to exchange the new telephone numbers with OWENS.  Therefore, agents cancelled their original plan to arrange a traffic stop of SOLARES on his way back to Charlotte.

[21] This call corresponds to Session #817 over TT7.

would return Wednesday (August 26, 2021).[22]  BARRERA then went on to discuss the amount of cocaine that he could traffick.  He told UM38 not to be concerned about giving him 5 kilograms of cocaine because he had a regular customer who sells three kilograms every two weeks and pays $35,000 to $36,000 per kilogram.  BARRERA added that he would sell the other two kilograms of cocaine at the current rate of $31,000 to $32,000 per kilogram and added that *"five is nothing."*  Based on these prices and additional intercepted communications, I believe that the regular customer BARRERA is referring to is OWENS.

33.     On August 31, 2021, five days after BARRERA and GOMEZ's return from Mexico, investigators conducted surveillance of BARRERA and GOMEZ. During the surveillance, agents saw them travel to a cellular phone store and apparently purchase new phones.  After leaving the store, agents followed them to the **SUBJECT PREMISES** in Albemarle, North Carolina.  BARRERA and GOMEZ remained at OWENS's residence for approximately three hours.

34.     Shortly after leaving the **SUBJECT PREMISES**, at approximately 8:40 pm, agents intercepted an outgoing call over TT5 from BARRERA to Matea Katic ("MATEA KATIC"), BARRERA's live-in fiancé.[23]    During the conversation, BARRERA said:  *"I just got finished where I was at."*  MATEA KATIC said:  *"I started*

---

[22] An airline alert on BARRERA and GOMEZ confirmed flight reservations on American Airlines departing Charlotte for Mexico City on August 21, 2021 and returning on August 26, 2021.

[23] This call corresponds to Session #2603 over TT5.

24

*to get worried.*" BARRERA said: "*It was my fault, I just did not want to turn on my phone.*" MATEA KATIC said: "*I understand. I figured you would be done by now.*" BARRERA said: "*I wasn't sure if we should go there but then decided just to and found him outside.*" MATEA KATIC asked: "*Did you not have his number?*" BARRERA said: "*No that is why I went to look for him.*" MATEA KATIC acknowledged. BARRERA said: "*I lost his number. He had about six phones that he went and paid to get numbers out of them looking for my number (laughed). He had a broken phone and had to get it fixed because he had some numbers of mine there.*" MATEA KATIC acknowledged. BARRERA laughed and said: "*It had been a month since I spoke to him.*"

35. Based on my training, experience, knowledge of this investigation, physical surveillance, and the above call, I believe that BARRERA and GOMEZ traveled to the **SUBJECT PREMISES** in Albemarle because BARRERA had been unable to reach OWENS—one of his key narcotics customers—by phone. Based on intercepted communications occurring over TARGET TELEPHONE #7, I know that BARRERA placed numerous outgoing calls and text messages to one of OWENS's prior phones, which went unanswered. During this call, I believe that BARRERA told MATEA KATIC that he went in person to find OWENS. BARRERA said he turned his phone off while he was there, demonstrating his sensitivity to law enforcement surveillance, including electronic surveillance. BARRERA explained that he had not spoken to OWENS for approximately one month, which is consistent with OWENS ceasing use of the phone with which he had been communicating with BARRERA prior to investigators' seizure of $359,701 from the BARRERA DTO on July 22, 2021.

25

This conversation, the Chevrolet Tahoe tracking data, and additional case related information confirm that BARRERA utilizes cautious measures and practices compartmentalization over a number of communication devices, which he uses in furtherance of his criminal activities in an effort to thwart law enforcement efforts. Indeed, through telephone toll records and the use of a cell-site simulator, investigators have identified approximately 20 cell phones that BARRERA has used over the past approximately two-and-a-half years. Based on the wiretap interceptions, telephone toll records and additional case related information, investigators know BARRERA, OWENS, GOMEZ and other members of the DTO regularly "drop" or changes cell phones, a practice of sophisticated drug traffickers.

36. On September 1, 2021, location data for BARRERA's Tahoe showed it traveled to the **SUBJECT PREMISES** in Albemarle and remained approximately one hour before returning to Charlotte.

37. On October 21, 2021, agents installed a court-authorized GPS tracking device on SOLARES's rental vehicle, a black Volkswagen Tiguan, and began monitoring its activity.[24] On October 27, 2021, agents monitoring the GPS tracking device on the Volkswagen Tiguan and GPS information associated with SOLARES's phone (also pursuant to a warrant) determined that SOLARES was traveling east from Charlotte towards Albemarle, where OWENS lives and operates. At approximately 1:20 pm, the tracker data indicated that SOLARES arrived at the **SUBJECT**

---

[24] Indeed, investigators have obtained tracking warrants from this Court for multiple vehicles driven by SOLARES during this investigation.

26

**PREMISES** in Albemarle. At approximately 1:40 pm, investigators saw SOLARES's Volkswagen Tiguan parked in the driveway and SOLARES walking from the residence to the vehicle. SOLARES drove away shortly thereafter.

38. On February 1, 2022 BARRERA and GOMEZ traveled from Charlotte, North Carolina via American Airlines to Mexico and returned on February 4, 2022.

39. On April 28, 2022 tracking data for BARRERA's Tahoe showed it left BARRERA's residence and traveled to the suspected stash location at Kayla Lane in Charlotte. Later the same day, the Tahoe traveled to the **SUBJECT PREMISES** in Albemarle arriving at approximately 2:00 pm. At approximately 3:30 pm the Tahoe traveled to a restaurant in Albemarle. Later the same day, the Tahoe returned to the **SUBJECT PREMISES** and remained for approximately an additional four hours before returning back to Charlotte, NC. In similar fashion to the meeting occurring between BARRERA/GOMEZ and OWENS on August 31, 2021 mentioned above, I believe the purpose of this trip to **SUBJECT PREMISES** was most likely to exchange newly obtained telephone numbers and to discuss their continued drug trafficking enterprise.

40. On April 20, 2022, a federal grand jury in the Western District of North Carolina indicted eleven members of the DTO on federal drug trafficking charges. On May 18, 2022, a federal grand jury in the Western District of North Carolina returned a superseding indictment charged a total of fourteen members of the DTO on federal

drug trafficking charges including OWENS.[25]  The indictment is sealed.

**CONCLUSION**

41.     I submit that this Affidavit supports probable cause for Search Warrants authorizing the search of the **SUBJECT PREMISES** described in **Attachments A** respectively, for the items described in **Attachments B**, respectively.

RESPECTULLY SUBMITTED,

/S/ Thomas J. Laverde
Thomas J. Laverde
Task Force Officer, DEA

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this __20__ day of MAY, 2022, at __4:02__ ~~a.m.~~ (p.m.)

The Honorable Joi E. Peake
United States Magistrate Judge

---

[25] On April 20, 2022, a federal grand jury in the Western District of North Carolina returned the original indictment in this matter, which charged eleven members of the DTO with federal drug trafficking charges.  The superseding indictment added three defendants and one drug trafficking count.

28

## ATTACHMENT A
### Property to Be Searched

The property to be searched is the residence located at 219 Austin Street, Albemarle, NC 28001 ("**SUBJECT PREMISES**"). The **SUBJECT PREMISES** is a single family residence located at the intersection of Austin St. and Bost St. The **SUBJECT PREMISESS** is constructed of red brick and has a red roof. Below is a photograph of the **SUBJECT PREMISES**.



## ATTACHMENT B

### Particular Items to Be Seized

The following items tending to establish: (i) the distribution of or the possession with intent to distribute controlled substances, or attempt or conspiracy to commit the same, in violation of Title 21, United States Code, Sections 841(a) and 846; and/or (ii) money laundering or conspiracy to commit same, in violation of Title 18, United States Code, Sections 1956 and 1957.

1. Documents and other records used to facilitate drug trafficking activities, in the form of ledgers, travel documents, bank and other financial records, address and telephone books, drug customers lists, and other papers containing the names and telephone numbers of co-conspirators;

2. Paraphernalia used to manufacture, package, distribute, and conceal narcotics;

3. Photographs of narcotics traffickers, narcotics, drug proceeds, and firearms;

4. U.S. currency greater than $500, and any lock box or safe;

5. Money wrappers and currency counting machines;

6. Documents and other paperwork, including lease agreements and paid utility bill receipts, reflecting occupancy and use of the property;

7. Documents relating to the ownership, possession, and control of vehicles, including vehicle titles, registration, and insurance documents;

8. Security systems and video footage;

9. Firearms, ammunition, and firearm accessories; and

10. Cellular telephones, tablets, and laptops (a separate search warrant will be sought before electronic devices are searched).